OPINION OF THE COURT
Harold Hyman, J.
The assignee for the benefit of creditors has filed and moved to settle his final account, fixing his commissions, and for an allowance for fees to his counsel and to his accountant and for other related relief.
Because of certain oddities contained in the administration of the estate herein, the court directed a hearing regarding the public sale of the assets, as to commissions, and certain other expenses deducted therefor by the auctioneer. In addition there are other matters with which the court, in its duty to examine each account and approve or disapprove thereof, will address itself to.
Primarily, the court must address itself to the fact that from the inception of these proceedings the assignee was, *764 and is himself a duly licensed attorney of this State, one who has been mainly engaged in the speciality of insolvency proceedings and who is known in the field of such speciality as one with no small knowledge, but rather is known to have extensive expertise in said field. Furthermore, in retaining his own law firm (wherein he was at least a knowledgeable senior partner) it was done without application to the court contending that there was any need for an attorney, or that his partner or partners were more knowledgeable in said field than he, and therefore such retention was required (Levy’s Accounting, 1 Abb NC 177; Matter of Dean, 86 NY 398; Litchfield v White, 7 NY 438; Harris for Modern v Nachamie, Supreme Ct, Queens County, Aug. 11,1977, Hyman, J.; Matter of G. I. Distributors v Frier, Supreme Ct, Queens County, Aug. 4, 1978; Matter of Arthur Hettich, Inc. v Marcus, Supreme Ct, Queens County, Sept. 19, 1978, Hyman, J.). In the latter case this court stated: “ ‘he could very well have handled by himself without making the slightest ripple in the every day stream of his insolvency speciality’ and ‘Where the Assignee is himself an attorney, only where difficult questions arise in the administration of the estate which require greater expertise than that of the Assignee, a “specialist” attorney, one with more than ordinary knowledge in that specific field of law, may such an Assignee retain counsel and only then, upon due application and permission of the court’ (Matter of GI Distributors, Inc., [supra]; see also, SEC v Kenneth Bove, & Co., USDC, So. Dist, of NY 72-2887, dec. June 2, 1978, NYLJ, June 6, 1978, Pollack, J.).”
Under such circumstances it cannot be expected that the court has looked with great favor upon the application of the assignee to remunerate his own law firm as “his” counsel in these proceedings.
The foregoing, among other things, lends credence to the belief that the mistaken impression of certain assignees, their self-chosen attorneys, auctioneers and accountants, is that an assignment for the benefit of creditors does not really mean what it purports to be, that is, a proceeding “for the benefit of creditors.” The Legislature certainly never intended that such a proceeding be one for the *765 benefit of anyone other than “creditors”. The Legislature definitively intended it to be an expeditious method in administering an insolvent debtor’s estate economically and efficiently (Matter of Arutt v Multer, 42 AD2d 366, 368). From the papers submitted it would seem that the applicants herein do have such an erroneous impression, as well as erroneous impressions in other matters pertaining to the administration of this estate.
The court has noted that the assignment for the benefit of creditors herein was executed on February 23,1976, and filed in the Queens County Clerk’s office on February 24, 1976, over seven years ago, and the petition of the assignee’s law firm seeking fixation and allowances of its fees based its contention for retention, stating: “7. The Assignee, in accordance with then acceptable [since proscribed]| procedure then retained Angel & Frankel, P.C. as his attorneys to represent him in the Assignment proceeding.” (Emphasis added.) That position is both untenable and unacceptable. The law for many years prior to the date of this assignment in 1976, was and still is, that while an assignee for the benefit of creditors is entitled to reimbursement out of the assigned estate for all “necessary expenses” incurred by him in the execution of his trust, his right to encumber the estate by employing professional advice is limited to such as one of ordinary prudence and caution would undertake “in the management of his own affairs.” (Levy’s Accounting, 1 Abb NC 177, 182, supra; Matter of Dean, 86 NY 398, supra; Litchfield v White, 7 NY 438, supra.) That better expertise in the “specialty” of insolvency proceedings was necessary than that of the present assignee-attorney has not been shown. That none was required is self-evident by the simplicity of administering this estate indicated by the activities of the assignee-attorney herein, although it appears that all of assignee-attorney’s activities are not entirely acceptable.
On February 24, 1976, the assignee-attorney made application to the Honorable Leonard L. Finz for an order authorizing public auction sale of the assignor’s assets; he obtained the ex parte order on said date which directed the sale be advertised in the “L.I. Press.” As is permissible by statute, the assignee retained an auctioneer (who inciden *766 tally filed the assignment on said date and who advanced the filing fee — $25; auctioneer’s report dated May 11, 1976 — filed Aug. 20, 1976, as part of the assignee’s “Interim Schedules”). The court observed the statement contained in the attorney’s petition, which would lead one to believe that the court “authorized the Assignor to employ the firm of David Strauss & Co. Inc. to conduct an auction”, thereby inferring that the ordering court had some input in assignee’s selection of the auctioneer. That statement is just not credible, believable or acceptable, but is intolerable. The sole authority to select the auctioneer rested with the assignee (Debtor and Creditor Law, § 14). Except for the two advertisements in the Long Island Press, which totaled $45.60, no other newspaper had been mentioned, nor had the assignee subsequently required any other newspaper advertisements from the court at any time. While the Legislature has permitted the assignee to designate and employ an auctioneer (Debtor and Creditor Law, § 14; Matter of Arutt v Multer, 42 AD2d 366, supra), it does not follow that the assignee may, with impunity, permit the auctioneer to take matters into his own hands and disregard, modify or embellish any order made by the court. The statute specifically provides that: “It shall be the duty of the assignee to collect and reduce to money the property of the estate, under the direction of the court”. (Debtor and Creditor Law, § 14.) It does not allow for the assignee or his auctioneer to take matters into their own hands and do otherwise without express permission of the court. That it was done in this estate cannot be considered by the court to have been a mere oversight, in view of the fact that when the auctioneer remitted to the assignee (two and one-half months after the sale), he did so by “net amount”, after he first deducted all of his alleged charges and expenses, and as to which the assignee-attorney admittedly registered neither objection nor complaint. Even the auctioneer’s procedure in remitting a “net amount” instead of a “gross amount”, thus leaving it to the court to primarily pass upon his charges upon an application thereafter made by the assignee for permission to pay the auctioneer, was improper. That procedure was long ago disapproved of.
*767 Since the auctioneer is subject to summary jurisdiction by the court (Matter of Arutt v Multer. 42 AD2d 366, supra), the assignee is duty bound to examine all charges made by the auctioneer and to report thereon and apply to the court for approval of same, and this is particularly so because the court itself is duty bound to carefully scrutinize all costs and charges since it is not bound by any agreement, if any, between the auctioneer and the assignee (Matter of Vogue Pleating & Embroidery Co., 11 AD2d 358; Debtor and Creditor Law, § 15, subds 12,17). Since, where an assignee for the benefit of creditors mistakenly had paid a portion of the assigned estate to one not entitled thereto (Matter of Premier Container Corp. [Leinwand], 95 Misc 2d 859), it likewise follows that the court has the power to order and direct a recipient to return funds mistakenly or improperly allowed by the assignee (Matter of Premier Container Corp. [Leinwand], supra; Debtor and Creditor Law, § 15, subds 12, 17). This, among others, was one of the reasons the court directed a hearing, which it held and, in which the assignee contritely admitted his error.
The charges for advertising, other than that directed by the order of the court previously mentioned, and which amount to $3,307.35 were unauthorized but, under the odd circumstances of this estate, with good monetary results emanating from the sale, said charges are allowed nunc pro tunc.
The auctioneers are organizations, business entities, and as such they have certain expenses in connection with their businesses. Those expenses are of such nature as with all business entities which lend themselves to some form of advertising to enhance their status in the trade and to thus increase their gross income. So it is with auctioneers.
It is part of the auction business or profession to obtain the greatest possible amount of money for that which is auctioned. It is of personal monetary benefit to the auctioneer, as well as his duty to his client, that he do so; but, in doing so, the auctioneer, although the “agent” of the assignee, is not an “employee” of the assignee. To the contrary, the auctioneer is an independent contractor operating in an assignment proceeding such as this upon a commission basis; the percentage of commission being *768 regulated by court rule and subject to the jurisdiction of the court.
It is with such background that the issuance and printing of circulars to the trade are considered; they are solely “business expense” of the auctioneers, and, as such, are not chargeable against the estate. This court has made its position known many times as to such type item. The assignee, not having objected to such item, is surcharged therefor $885.60.
The next questionable item listed by the auctioneer is entitled “Enclosed, meter and mail 6,525, trucking, postage, etc. — $981.94.” What this item is supposed to portend or specify is unascertainable, but it is assumed it had to do with the mailing of circulars to the trade. At the very least the assignee should have sought a breakdown and bills to substantiate the fact of it being a lawful expense of the estate. Lacking such, the assignee is surcharged such amount of $981.94.
The next of the questionable items are “Addressing #10 envelopes, etc. A. F. Lewis — $263.58”; “Envelopes — Print Art Co. — $68.51”; and “Special Mailing List — Print Art — $30.00”. Here again the above appear on their face to solely be “business expenses” of the auctioneers. The items total $362.09 for which the assignee is surcharged.
There'are other items which are disallowed as being “business expenses” of the auctioneers and not of the estate, namely, (a) Social Security — $202.41; (b) unemployment insurance — $173; (c) workers’ compensation — $383.76. These items total $759.17 for which the assignee is surcharged.
Although it might appear to be diminutive, as compared to the total sale made to the purchasers of single lots, the sum set forth by the auctioneers “less short and allowance of $259.50” was apparently acceptable to the assignee without proof or definitive explanation. How this could come about cannot be understood, particularly so where all merchandise was “tagged”. Here the auctioneers claimed 41 man-days of labor, during which they allegedly had an “experienced bookkeeper”. With that much experience present at the sale the loss cannot be deemed acceptable. The assignee is surcharged $259.50.
*769 The assignee entered into a written agreement with a secured creditor to pay the auctioneers a commission of 15% plus all expenses chargeable to the estate. This commission was more than twice the amount permitted by the rules. It must be remembered that although the assignee had the statutory authority to select the auctioneer of his choice (Debtor and Creditor Law, § 14) that does not give him the power to agree to pay commissions in an amount or percentage in excess of or in violation of the rules of the court, nor which may be inordinate in amount. Certainly the assignee herein had knowledge of the fact that 15% commission was far beyond the scope of the maximum allowance permitted by the rule which provided for 71/2% on the first $10,000 or any part thereof; 5% of the next $15,000 or any part thereof; 3% of any amount over $25,000.
The assignee offered proof at the hearing that it was deemed advisable to have an “auctioneer associate”, one with a greater knowledge and “trade following” in the printing-bookbinding business, to assist with the sale. Even if this be so, and even if the alleged “associate” requested a commission for himself, why then was it necessary to have the primary auctioneer, the one selected by the assignee, at all? Why two auctioneers? Could not the so-called “associate” have handled the entire transaction? With his alleged knowledge, expertise, and trade following, what need was there for the so-called “primary auctioneer”?
Assuming that it was necessary to use both auctioneers, did that, in and of itself, give the assignee the power or right to enter into an agreement providing for the auctioneer’s commission to be a “flat 15%”? More than twice the amount allowed by the rule, without court approval? Even assuming both demanded a separate commission, would not 5% for each have been more than sufficient bearing in mind even that amount would have exceeded the rule? To say that the “secured creditor” insisted upon the payment of 15% to assignee’s auctioneer is not substantiated by the written (amended) stipulation of March 4, 1976. That agreement permitted the sale to be conducted by the auctioneer selected by the assignee, but it certainly does not *770 mention any definitive commission of 15% to be paid to the auctioneer, nor does it provide for two auctioneers; his explanation, testified to at the hearing, would lend some credence to his act which could allow for this court exercising its discretion under the circumstances then existing, effective nunc pro tunc.
On March 2, 1976, two days before the written (amended) stipulation was executed by the assignee and the secured creditor, the auctioneer was retained by the secured creditor “in its own behalf” to conduct an auction sale and to receive 15% of the gross as commissions. But this was apparently negated by the assignee and the secured party by their own later agreement of March 4,1976; and, since that same auctioneer had been already selected by the assignee prior to March 2, 1976, he certainly must have been knowledgeable that his prior 15% agreement was worthless as against the assignee, and that the secured creditor could not impose it’s will upon the assignee, at least not beyond the power of the assignee to do or agree to. The assignee was not dealing with an auctioneer who was a neophyte in the field or with which the assignee was dealing for the first time. In any event, the assignee could have and should have presented his possible dilemma to the court for resolution. He knowledgeably and admittedly chose not to do so. He knowledgeably permitted the auctioneer’s charges to go unchallenged. Although the assignee should be surcharged, this court, with its equitable power to do so, will, under the extraordinary circumstances testified to, allow same nunc pro tunc. The court is well aware that such commissions are for an amount far in excess of that set forth by the rules, and by nunc pro tunc allowing same does not wish the procedure to set any precedent.
assignee’s commissions
The total “receipts” claimed by the assignee are $45,407.18. Of this amount the “refunds”, “previously commenced litigation”, “postage refund”, “dividend on a Workmen’s Compensation policy for 1974-1975” (prior to assignment), “return premiums” (previously paid by assignor), “interest” on previous accounts of assignor and on those established by the assignee, are deemed “transfers” upon *771 which distribution commissions of 2Vz% only are allowable. The “transfers” amount to $14,142.66, and are to be computed as “distributing commissions” at the rate of 2XA% of such allowable commissions which amount to $353.56 (Matter of Hulburt [Van Sinderin], 89 NY 259; Matter of Kraemer [Sandfield], 40 AD2d 1053; Matter of Woven Tape Skirt Co., 85 NY 506). The other remaining items total $31,264.52; full commissions are allowable thereon at 5%, amounting to $1,563.23. The total commissions which would therefore be allowable are $1,916.79.
On the other hand, it is to be noted that although the auctioneer was busy with this estate to the extent whereat he claims 65 man-hours for sorting, lotting, and attending delivery from March 1, 1976 through March 26, 1976 (excluding therefrom “bookkeeper” charges, e.g., March 11, “day and night”), not once does the assignee state in his petition any indication that he ever attended the sale or was personally at the premises to observe what was taking place during the entire 26 days.
In its petition for counsel fees, the “law firm” avers that, “it”, “Petitioners attended at the said auction sale.” Where was the assignee during the other 25 days? It is the assignee’s duty to see to it that no one, auctioneer or otherwise, deducts funds, claims payments for, or receives payment for services or claimed expenses neither rendered by said claimant or to which claimant is not legally entitled. This is not to say or charge the auctioneer with not being truthful, but the fact remains that 41 days from commencement to termination may be considered to be an inordinate period to be in possession of the premises, this particularly so since the sale took place on March 11,1976, and the amount charged for “use and occupation” of the premises was at no small cost; actually for the period from February 24, 1976 through April 6, 1976, the estate was required to pay the sum of $10,000 for the 41-day period, approximately $245 per day. The apparent allowance to purchasers of 26 days within which to remove their purchases cost this estate $1,990 in labor charges incurred by the auctioneer and $6,370 to the landlord for “rent-use and occupation” a total of $8,360, less five days, would therefore be $6,752.50. How can the court, with good conscience, *772 reconcile such an expense to the estate as being evidence of diligent performance of one’s duty as an assignee? There was nothing contained in the advertisements as to the sale which in any way could mislead the purchasers at the sale into believing that they had from March 11,1976 (the date of sale) to April 6, 1976 within which to remove their purchases. Nor does this court find any authority granted by the court order for any such inordinate period of possession for any purpose. Even if the court was to assume that five days beyond the date of sale would be a fair amount of time required to remove machinery, as above allowed, it would still leave a considerable unwarranted expense to this small estate. An examination of the papers filed herein indicates neither excuse nor explanation, and it requires a surcharge of the assignee therefor of $6,752.50.
The attorneys for the assignee, the latter’s own law firm, seek a fee of $7,000 for their services. The court has made known its views of disapproval on the circumstance of the assignee, an attorney, retaining his own law firm; these views were not new, they were made known many years ago by other courts. They were considered and labeled as a commingling of interests (Honorable Milton Pollack, U.S.D.J.). Securities & Exch. Comm, v Bove & Co. (NYU, June 6, 1978, p 1, col 4, p 28, col 3) wherein the court stated: A Judge should be able to rely on the trustee for aid in assessing the necessary expenses of administration, but a trustee who retains his own firm “disables himself from offering such assistance with respect to the application for counsel fees * * * A lawyer-trustee’s employment of his own law firm is questionable practice * * * to do so causes serious problems when compensation is sought * * * Only services requiring legal expertise are compensable by an award of counsel’s fees [and] enumeration of hours spent on clerical and ministerial services is doubly essential because the trustee, as a partner of the firm he retained as counsel, will share in the firm’s profits” and of course their fees.
The legal services rendered herein were simple and not in any respect extraordinary. The attorney-assignee’s astuteness and expertise apparently resulted in a $60,000 *773 monetary benefit to the estate, for which he, in his dual capacity, would, at best, be entitled to some remuneration.
This estate has been pending since 1976. On March 3, 1976, at the request of the assignee, the court permitted the retention of an accountant. Certainly from that date and until December 31, 1980 the accountant should have filed a report with the assignee. If he had, it most certainly would have indicated that a priority tax claim of $6,769.91 existed in favor of United States Internal Revenue Service. To pay such priority claim promptly from assets of the estate was a duty of the assignee. From May 11, 1976 on, the assignee had more than sufficient funds with which to do so; nevertheless he did not.
Similarly, State and city priority or tax claims have remained unpaid without good and valid reason.
Likewise, a “wage” claim, reduced to $1,000 by court order on August 11, 1980 remains unpaid. Also priority union claims, as reduced since August 11, 1980, remain unpaid, all without any reason or explanation.
What seems to have been totally overlooked by the assignee and his attorney — “law firm” is what bears repeating, namely, that the main purpose of the Legislature in enacting the legislation under which this assignment was given, was to provide for an expeditious and inexpensive method of dissolving an insolvent’s estate into money for distribution to its creditors. To withhold distributing funds for “wage” claims, or tax claims or governmental agencies, cannot be otherwise than frowned upon; there can be no excuse for not paying said claims when the funds have existed for so many years.
The accountant seeks a fee of $7,300 claiming 332 man-hours of work. No report has been filed by the accountant herein showing what that work consisted of, what was found or what was determined, or of what use it was.
The attorney’s petition states that “The accountant’s audit efforts are contained in a report dated February 24, 1976.” It is therefore very apparent that the accountant had to have been retained some time prior to the execution of the assignment which was executed on February 24, 1976. Apparently this report was rendered so as to assist
*774 the assignor and its counsel’s conference of February, 1976 in determining the assignor’s financial position for the purpose of deciding the viability of assignor continuing in business. The assignee-attorney’s petition frankly states that “the Assignor’s assets did not nearly approach its liabilities — the Assignor could not possibly continue its business” and therefore the assignment was accepted and filed on February 24, 1976.
Although the application to retain an accountant was first made on March 3, 1976 (as stated by the accountant), the audit referred to by the assignee dated February 24, 1976 could only have been made with respect to efforts of continuing the assignor’s business for the preassignment conferences regarding such, and before the assignment was executed. It cannot, therefore, be deemed nor made a charge of this estate except as a “general creditor”, but certainly not as an administrative expense.
Under the circumstances, the joint commissions and attorney’s fees are hereby allowed in the total sum of $8,916.79, which sum is to be applied against the surcharges previously set forth and which, without surcharging interest, would leave a deficit due and payable to the estate by the assignee of $1,084, but, which surcharges the assignee, if so advised, may seek recoupment from the auctioneers by separate proceeding herein upon issuance of a separate citation.