OPINION OF THE COURT
Allan L. Winick, J.
By order to show cause dated June 23, 1986, the assignee had moved for an order, inter alia:
*956 (1) settling and allowing his final account as filed;
(2) fixing his commission as assignee; and
(3) granting allowances to the three attorneys he has had during the course of his administration of this estate, for their professional services in behalf of the assigned estate.
The motion was denied in a memorandum decision and order dated August 4, 1986, and was scheduled for reconsideration on September 8, 1986. The assignee and his several counsel were directed to submit certain specified documentation and explanations prior to that adjourned date. That material has now been submitted, and this matter is ready to be considered again.
Upon reconsideration, the assignee’s final account, as amended and supplemented, is settled and allowed, with the following proviso. Schedule E-6, General Unsecured Claims, is hereby amended to reflect total unsecured claims filed and allowed in the amount of $118,295.94. Schedule F, Recapitulation, is hereby amended to reflect,
"6. General Unsecured Claims 118,295.94
"Total Liabilities $200,799.79”
The fixing of the assignee’s commission, and the granting of allowances to the assignee’s attorneys for their professional services, cannot be done in this case in a pro forma manner and without elaboration. The distressing and very unfortunate circumstances disclosed herein require comment. In Matter of Promotional Servs. (Kaufman) (NYLJ, Apr. 28, 1986, p 15, col 3), this court had occasion to note that, as a result of a series of published decisions spanning a 10-year period, Justice Harold Hyman of the New York State Supreme Court, Queens County, had become "the principal instigator” of a campaign to reform certain "prevalent customs” in State insolvency practice. The aim of that campaign was to again make the assignment for the benefit of creditors proceeding that which the Legislature had originally intended when it enacted the Debtor and Creditor Law — an expeditious method of administering an insolvent debtor’s estate, economically and efficiently and for the benefit of its creditors. (Matter of Fisher Bookbinding Co. [Angel], 119 Misc 2d 763, 765, citing Matter of Arutt v Multer, 42 AD2d 366, 368.) A particular target of Justice Hyman’s wrath was, "the mistaken impression of certain assignees, their self-chosen attorneys, auctioneers and accountants * * * that an assignment for the benefit of credi *957 tors does not really mean what it purports to be, that is, a proceeding 'for the benefit of creditors.’ ” (Matter of Fisher Bookbinding Co. [Angel], supra, p 764; In re Fresh Meadows Inn [Waxman], NYLJ, Feb. 3, 1977, p 14, cols 3-5; Gotham Bldrs. Supply Corp. v Gutman, NYLJ, Sept. 2, 1977, p 12, cols 5-6.) It would not be unreasonable to hypothesize that the initial inspiration for his campaign came from a case similar to this one.
At pages 3 through 5 of the memorandum decision and order of August 4, 1986, this court made certain observations concerning the administration of this estate, based upon the papers then before us. In substance, it was pointed out that the assignment indenture had been executed on July 11, 1980, and filed with the Nassau County Clerk on July 14, 1980. The assignee and three different attorneys had then each claimed to have worked diligently and with care in the ensuing six years to expeditiously and economically administer the estate. However, there was nothing then before this court to indicate that this matter was anything other than a quite ordinary, run-of-the-mill proceeding, readily closable within the time limitations set forth in the rules of court. (22 NYCRR 202.63 [d] [9], formerly 22 NYCRR 677.4 [i].) The responsible parties were therefore directed to show good cause why this matter had been pending for such a seemingly inordinate period of time. This court advised the parties that this showing was particularly important in view of the court’s relatively recent decision in Matter of Promotional Servs. (Kaufman) (supra), and in view of the amount of money "apparently squandered”, because of the length of administration, on such items as bond premiums and the storage of books and records. (See also, Matter of Fisher Bookbinding Co. [Angel], supra; In re Fresh Meadows Inn [Waxman], supra.) To further emphasize the importance of making this showing of good cause, this court warned the parties that the foregoing tended to belie their claims of diligence and efficiency. So, too, did certain other details of the administration of the estate, such as the sudden "discovery” of apparently "lost” claims. This court pointed out that such "details of administration” tend to demonstrate the true extent of the diligence, astuteness and expertise that all assignees and their attorneys invariably claim to have exercised in their petitions for commissions and fees (Matter of Fisher Bookbinding Co. [Angel], supra), and also provide an insight into the amount of work it can reasonably be concluded was justifiably spent on the administration of an as *958 signed estate. (See, National Assn. of Concerned Veterans v Secretary of Defense, 675 F2d 1319, 1326; see also, Matter of Pet Rack Distribs. [Rothman], 81 Misc 2d 727.) This court stressed that, absent the explanations to be submitted, considering the size of this estate, the nature and source of its assets, and the various aspects of its administration already discussed, it would be "difficult to accept the necessity of three experienced insolvency attorneys expending a total of 120 hours of diligent professional labor over a period of six years, to 'economically and expeditiously’ administer it.” And, on the face of it, it would be "difficult to see how the assignee, the presumed 'overseer’ * * * could possibly be entitled to the maximum allowable commission for his administration of this matter.” (See generally, Matter of Promotional Servs. [Kaufman], supra; Matter of Pet Rack Distribs. [Rothman], supra; Matter of Fisher Bookbinding Co. [Angel], supra; Matter of Multiponics, 622 F2d 731, 733; Debtor and Creditor Law § 21; Bartell, Petition for Attorneys’ Fee — the Evidentiary Issues, NYLJ, June 28, 1982, p 1, cols 2-3.) All of the applicants for commissions and allowances were then "invited” to submit to this court any additional information they would wish considered concerning their efforts in behalf of this estate.
What this court received in response to all of the foregoing can, in the kindest term possible, be described as shocking. This court is now in receipt of:
(a) the affirmation of James D. Camp, Esq., dated August 11, 1986;
(b) a letter (neither sworn to nor affirmed) from Leon C. Marcus, Esq., dated September 3, 1986; and
(c) a series of letters, the first of which is dated February 3, 1982, exchanged by the assignee, Mr. Camp and Mr. Marcus. Taken together, these exhibits indicate, among other things, that:
(a) as early as February 3, 1982, the assignee considered that this matter had gone on long enough and should soon be ready to be closed;
(b) according to Mr. Marcus, the last asset was collected and the estate was ready to be closed in October 1983;
(c) the assignee, incensed at the size of the fees requested by Mr. Camp and Mr. Marcus, refused to sign and submit the final account on or about January 30, 1984;
(d) Mr. Camp and Mr. Marcus had a running feud over the size of their respective compensations and the filing of the *959 final accounting that began in or about December 1983 and ended finally in or about June 1986. In the course of their correspondence, Mr. Marcus had occasion to lecture Mr. Camp on the unethical (and potentially disbarrable) nature of fee splitting. Mr. Camp, in his turn, found it necessary to report Mr. Marcus’ activity (or rather, lack thereof) to the Bar Association; and
(e) as the foregoing fur flew, the assignee, aside from an occasional threat to retain new counsel, was conspicuously absent. New counsel was finally retained on June 5, 1986.
Mr. Camp blames all of the delay in this case on Mr. Marcus, and attempts to array himself in a cloak of purely altruistic motive. Mr. Marcus asserts the delay was beyond his control (although he apparently had the bulk of the estate paperwork), the kind of thing that just happens through the fault of no one. The assignee apparently takes the position that no one was prejudiced by any of this, claiming in essence that he did what all good assignees should do, and that he followed the advice of counsel. New counsel remain neutral vis-á-vis the "squabble” between Mr. Camp and Mr. Marcus, although it was at their urging that a truce of sorts was finally reached.
This court, appreciative of the effort expended to bring these views before the court, must respectfully dissent from each. The blame for the inordinate delay in this case must be apportioned, not necessarily equally, among the assignee and his original cocounsel, Messrs. Camp and Marcus. The ultimate responsibility for bringing an assigned estate to an economical and expeditious conclusion is with the assignee. (Debtor and Creditor Law § 14.) He cannot stand by idly and allow a simple proceeding to drag on for from three to four years longer than necessary, in the main because the attorneys he retained to advise him cannot agree on which of them deserves what fee. And, if the assignee bears the ultimate responsibility, then surely the penultimate responsibility for bringing an assigned estate to a proper conclusion must be assigned to the assignee’s legal .counsel.
Assignees today hire attorneys as a matter of course even though the Debtor and Creditor Law never envisioned such a practice. Debtor and Creditor Law § 14 spells out the duties of an assignee, those duties for which the Legislature still considers a maximum 5% commission to be just compensation. Counsel is to be retained by an assignee to advise him only when "difficult questions” arise in the administration of an *960 assigned estate. (See, Levy’s Accounting, 1 Abb NC 177; Matter of Rauth & Son, 10 Daly 52; see also, Debtor and Creditor Law § 21.) However, the complexities of today’s business world make the retention of legal counsel by an assignee a virtual necessity. As a practical matter, assignment courts recognize this. So does every attorney who has ever appeared in this court as the legal advisor of an assignee for the benefit of creditors. Were this not so, it would never have been necessary for this court to state, on numerous occasions,
(1) that the intricacies of modern business can never justify an assignee abdicating his responsibilities and turning over to his attorneys the duties imposed by Debtor and Creditor Law §14;
(2) that an assignee doing so should not expect the maximum 5% commission or, for that matter, any commission at all; and
(3) that an assignee’s attorney will not be compensated for the performance of duties properly to be performed by the assignee.
(See, Matter of Promotional Servs. [Kaufman], supra; Matter of Island Provisions [Sarf], Nassau County Ct, Apr. 3, 1986, Winick, J.; Matter of Industrial Tool Dev. Corp. [Cherno] Nassau County Ct, May 27, 1975, Wilkes, J.) In this court’s view, the assignee and his original cocounsel share the blame for the delay herein.
Perhaps more distressing than the fact and length of a delay is how totally unwarranted and unjustifiable the delay here was. It is unconscionable that this proceeding has been delayed for from three to four years primarily because two members of the Bar of this State were quarreling about the size of their respective fees, a matter which both should know rests within the sound discretion of this court. (See generally, Debtor and Creditor Law § 21.) That their fee dispute may have ended at some point, to be replaced by laches, is of little avail. The administrators of this estate have demonstrated a callous disregard for its creditors. The rights and interests of the creditors were clearly subordinated to the egocentric whims and selfish pursuits of those charged with the estate’s administration. Inattention and inaction allowed this cavalier attitude to flourish beyond all reason. It certainly cannot be rationally argued that the "benefit of creditors” was the paramount concern here.
*961 One final comment is in order. Any notion that no harm has been caused by what occurred here is specious. Specifically, estate assets (particularly in the form of bond premiums and costs to store the assignor’s books and records) have been squandered. That interest was accruing while the administrators bickered excuses nothing. Furthermore, the insolvent debtor’s creditors were undeniably deprived of their interest in an economical and expeditious settlement. Finally, and perhaps most importantly, the law and rules of court were flagrantly disregarded, making this proceeding not much more than a mockery. At a time when it is particularly crucial to cultivate confidence in and respect for "the system”, a proceeding such as this is a very damning demonstration that cannot be tolerated. If there is a positive aspect to this regrettable matter, it is the reaffirmation that the means developed over time to analyze the administration of an insolvent’s estate do indeed work. That is small solace. "No assignee can expect any monetary consideration, nor can his attorney expect similar consideration, when he allows a simple proceeding to continue for an inexcusable and unreasonable length of time, without judicial sanction for the delay in final completion.” (In re Fresh Meadows Inn [Waxman] supra, cited with approval in this court’s decision in Matter of Promotional Servs. [Kaufman], supra.) Here, the assignee’s commission is fixed at $200. (Debtor and Creditor Law § 21.) The fee for James D. Camp, Esq., is set at $500. The fee for the firm of Marcus, Leitner, Greene & Preefer (by Leon C. Marcus, Esq.) is fixed at $750. The law firm of Yackow and Fox is allowed $1,250 for its professional services and $77.22 for reimbursement of disbursements made and to be made. These awards are based upon the papers presently before this court, and upon the foregoing discussion on which those papers prompted. This court has previously set forth, in some detail, the requirements for petitions for commissions and allowances, and the standards utilized to assess the merits of those requests. (Matter of Promotional Servs. [Kaufman], supra.) The commission and fees allowed here derive from the application of those requirements and standards to the factual circumstances presented by the administration of the instant estate. (See also, Matter of Pet Rack Distribs. [Rothman], supra; Matter of Fisher Bookbinding Co. [Angel], supra; Matter *962 of Multiponics, supra; Bartell, Petition for Attorneys’ Fee — the Evidentiary Issues, op. cit.)
Submit order in accordance with the foregoing, providing therein for the distribution of estate assets to the filed and allowed claimants in the order of their respective priorities in law. (22 NYCRR 202.48.)